**MASTER DISTRIBUTORS, INC., a New Hampshire corporation, Appellant,**

v.

**PAKO CORPORATION, a Delaware corporation; Pakor, Inc., a Minnesota corporation, Appellees.**

No. 92–1345.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1992.

Decided Feb. 17, 1993.

Rehearing and Rehearing En Banc Denied April 5, 1993.

Edward F. Fox, St. Louis, MO, argued (Donald W. Niles, Mark W. Haigh, on brief), for appellant.

David R. Fairbairn, Minneapolis, MN, argued (Thomas J. Stueber and Joseph R. Kelly, on brief), for appellee.

---

* The Honorable Bruce M. Van Sickle, United States Senior District Judge for the District of North Dakota, sitting by designation.

1. The district court refers to both tapes as blue. MDI suggests that the tapes are an aquamarine

---

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and VAN SICKLE,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

Master Distributors, Inc. appeals from an order granting partial summary judgment to the extent MDI claims common law trademark rights in the blue color of its "Blue Max" leader splicing tape. The district court held, as a matter of law, that color alone cannot be protected as a trademark, and that even if it can be protected, the color depletion theory, which assumes that new competitors would be precluded from entering an industry once all colors are used and protected, applies to this situation. 777 F.Supp. 744, 749–50 (D.Minn. 1991). We reverse and remand for further proceedings.

MDI manufactures and sells "Blue Max," a blue [1] leader splicing tape, which is used to attach undeveloped film to a leader card for photoprocessing through a minilab machine that develops the film and prints the photographs. *Id.* at 745. Blue Max was developed in response to the minilab industry's need for better leader splicing tape. Although leader splicing tape was traditionally black, it can be created in any color, and MDI dyed its Blue Max tape blue. *Id.* Blue Max is well-known and enjoys a reputation as the industry standard. *Id.* Both distributors and customers often order Blue Max by asking for "the blue tape" or simply for "blue." *Id.*

Pakor, Inc., a subsidiary of Pako Corporation, is a photographic supplies distributor, and was one of MDI's distributors with a nonexclusive right to sell Blue Max in the Midwest. *Id.* When MDI learned that Pakor was manufacturing and selling its own brand of blue leader splicing tape, "Pakor Blue," it brought this suit. MDI alleged infringement of its registered trademark, infringement of its common law trademark in the color blue, illegal "palming off," unfair competition, dilution of trademark,

blue, and perhaps a trier of fact could so determine—one is a somewhat deeper hue than the other, although almost imperceptibly so.

deceptive trade practices, false statements in advertising, and unlawful trade practices. *Id.* at 746. The cardboard core of the MDI tape contains the words "blue max," and the other tape core contains the words "Pakor blue" with a toll-free number. *Id.* at 745.

Pakor moved for partial summary judgment to the extent MDI claimed trademark rights in the blue color of its Blue Max tape.[2] *Id.* at 746. The district court granted Pakor's motion and dismissed Count II, alleging a common law trademark in the color blue, and Count V insofar as it claimed dilution of a common law trademark in the color blue. *Id.* at 750. MDI argues on appeal that the district court erred in granting summary judgment before discovery was complete, in adopting a per se rule that color alone can never achieve trademark protection, and in determining that the color depletion theory applies to the facts in this case.

Pakor urges us to affirm the district court's decision by adopting the "better, more widely-accepted rule of law, that a single color cannot function as. a trademark." Pakor directs us to many decisions which support its position and distinguishes those that do not. Pakor then argues that even if a single color may be protected under certain circumstances, the district court properly applied the color depletion theory, as a "competitive need" for the color blue exists in the leader splicing tape market.

We review the district court's grant of summary judgment de novo, and will affirm only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *McKee v. Federal Kemper Life Assur. Co.*, 927 F.2d 326, 328 (8th Cir.1991). We view the facts in the light most favorable to the nonmovant, and give it the benefit of all reasonable inferences. *Schrader v. Royal Caribbean Cruise Line, Inc.*, 952 F.2d 1008, 1013 (8th Cir.1991). Therefore, we assume, for pur-

poses of this appeal, that the color of leader splicing tape does not affect its function, that MDI can establish secondary meaning in the blue color of its tape, identifying and distinguishing it from other tapes, and that an infringing tape would confuse or mislead consumers. We must decide then (1) whether, as a matter of law, color alone cannot be afforded trademark protection, and (2) if color alone can be protected, whether the district court properly applied the color depletion theory to this case.

### I.

■ The United States Supreme Court has never expressly denied the possibility that color can be protected as a trademark. In *A. Leschen & Sons Rope Co. v. Broderick & Bascom Rope Co.*, 201 U.S. 166, 170–71, 26 S.Ct. 425, 426–27, 50 L.Ed. 710 (1906), *overruled on other grounds, United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court denied infringement protection to a trademark consisting of an unspecified colored streak woven into a wire rope. The Court noted that "a trademark could not be claimed of a rope, the entire surface of which was colored," but also stated that it might have sustained the registration if the plaintiff's claimed trademark was restricted to one specific color, such as red. *Id.* 201 U.S. at 170, 26 S.Ct. at 426. Ultimately, the Court declined to decide the color protection issue because the plaintiff's claim was much broader than protecting one distinctive color. *Id.* at 172, 26 S.Ct. at 427. This pre-Lanham Act opinion does not answer the color protection issue.

Likewise, we have not established a per se prohibition against protecting color as a trademark. Although we affirmed *Deere & Co. v. Farmhand, Inc.*, 560 F.Supp. 85, 96–98 (S.D.Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir.1983) (per curiam), our decision was not based on protection of color alone. The district court had found that the specific shade of green used on John Deere front end loaders was functional because farm-

---

**2.** Although MDI's complaint refers generally to "the color mark blue" and "use of the color blue," we assume that it intended to include only the particular blue shade of its Blue Max tape.

ers preferred to match the color of their loaders to the color of their tractors, and therefore, protection would hinder competition. 560 F.Supp. at 96 n. 19, 98. Our per curiam opinion did not discuss whether color alone could be protected. 721 F.2d at 253.

In 1985, the Federal Circuit allowed Owens–Corning to register the color pink as a trademark for fibrous glass insulation. *In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed.Cir.1985). After an historical review of attempts to register or protect color trademarks, the court, in a detailed and persuasive discussion of the Lanham Act, concluded that color met the Act's definition of "trademark," [3] and was not specifically excluded from protection. *Id.* at 1118–19. The court recognized the color depletion theory as an argument against the protection of color, but concluded that "[c]ontrary to an absolute prohibition on registrability of color marks, ... each case [should be] decided upon its facts." *Id.* at 1120. The court also rejected the traditional shade confusion argument, stating that "deciding likelihood of confusion among color shades ... is no more difficult or subtle than deciding likelihood of confusion where word marks are involved." *Id.* at 1123 (quoting *In re Owens–Corning Fiberglas Corp.*, 221 U.S.P.Q. 1195, 1198 (TTAB 1984)).

The dissent in *Owens–Corning* was relied upon by the Seventh Circuit in the only other decision to squarely face this issue.[4] In *NutraSweet Co. v. Stadt Corp.*, 917 F.2d 1024, 1027 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991), the manufacturer of a sugar substitute product that was packaged in a blue, single-serving packet brought suit to enjoin another manufacturer from packaging its sugar substitute in a blue, single-serving packet. *Id.* at 1026. The district court granted the defendant's motion for summary judgment, holding that color alone could not be protected. *Id.* Following *Life Savers Corp. v. Curtiss Candy Co.*, 182 F.2d 4, 9 (7th Cir.1950), and the dissent's reasoning in *Owens–Corning*, the Seventh Circuit affirmed and discussed four reasons for prohibiting the protection of color alone, as a matter of law. *Id.* at 1027–28. First, the court stated that protecting color as a trademark would change the law in the Seventh Circuit and prejudice lawyers and clients who had acted in reliance on the old rule. *Id.* at 1027. Second, the court did not see a need for change because color could be protected as long as it was used in connection with a symbol or design or impressed in a particular design. *Id.* Third, the court reasoned that shade confusion could only be resolved through litigation. *Id.* Finally, the court stated that the facts in the *NutraSweet* case were not appropriate for changing the law because color depletion would deter new entrants from lawful competition in the table-top sweetener market. *Id.* at 1028. Although NutraSweet contended that the possibility of color depletion was a factual issue, the court rejected the standard as "unworkable, for there is no way for a court to predict the likelihood of future competitors in a particular market." *Id.*

The district court in this case was also persuaded by the *Owens–Corning* dissent, and followed the Seventh Circuit's decision to prohibit protection of a specific color.

---

**3.** The section 45 definition of trademark includes: "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127 (1988).

**4.** Other circuit courts have mentioned or briefly discussed this issue without directly deciding it. *See, e.g., Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 221 (1st Cir.1989) (declining to decide because the color blue was used in conjunction with a non-functional shape); *First Brands Corp v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381–83 (9th Cir.1987) (affirming denial of a preliminary injunction when district court found a competitive need for the color yellow and plaintiff failed to establish secondary meaning); *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1149 (3rd Cir.1986) (affirming district court's decision that use of pastel colors, even in connection with a distinctive design, `was functional); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1548 (11th Cir.1986) (declining to decide the issue when plaintiffs did not establish secondary meaning in the color blue), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

777 F.Supp. at 749. The court reasoned that protecting Blue Max blue could hinder competition, particularly because leader splicing tape is available in a variety of colors. *Id.* The court was concerned that even if Pakor selected another shade of blue, it would be difficult to decide how different that shade must be to avoid infringement, and that Pakor's selection would "eliminate another shade from those available to new entrants into the market." *Id.* at 749–50.

We are not persuaded by the three traditional arguments against protection—the color depletion theory, shade confusion, and the functionality doctrine. Nor are we impressed by the argument that "consistency and predictability" require a per se prohibition against trademark protection for color alone. We believe that not allowing manufacturers to protect color marks when all the traditional requirements have been met will actually promote inconsistency and confusion.

■ Proponents of the color depletion theory assert that there are only a few possible colors a manufacturer can choose for a product, and allowing one manufacturer to monopolize one color "in all of its shades" will inhibit competition. *Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 798 (3rd Cir.), *cert. denied*, 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949). We agree that allowing a manufacturer to monopolize red "in all of its shades" would deplete the color choices available to other market participants. Allowing a manufacturer who has met all the normal requirements for obtaining trademark protection to protect a specific shade of color, however, is another matter. MDI directs us to A. Kornerup & J.H. Wanscher, *Color Atlas* 7 (1961), which contains the names and samples of 1,266 colors, and to the National Bureau of Standards list of 267 distinctive color designations. Kenneth L. Kelly & Deane B. Judd, *Color: Universal Language and Dictionary of Names* 4 (1976). More importantly, a manufacturer's mere use of a certain color will not automatically grant it proprietary rights—the manufacturer must establish all the normal requirements for trademark protection, including secondary meaning. Until secondary meaning has been established in every distinguishable shade of color and in no color at all, a highly improbable situation, there will always be an option available to a new market entrant.

Although protecting particular shades of color may result in some shade confusion problems, we agree that " 'deciding likelihood of confusion among color shades ... is no more difficult or subtle than deciding likelihood of confusion where word marks are involved.' " *Owens–Corning*, 774 F.2d at 1123 (quoting *Owens–Corning*, 221 U.S.P.Q. at 1198). Triers of fact must often answer close and difficult questions, and the traditional likelihood of confusion standard should be applied to distinguish similar colors, as it is when similar slogans, symbols, numbers, or words are compared. *See, e.g., Dial–A–Mattress Franchise Corp. v. Page*, 880 F.2d 675 (2d Cir.1989) ("1–800–Mattress" and "Dial–A–Mattress"); *Kimberly–Clark Corp. v. H. Douglas Enters., Ltd.*, 774 F.2d 1144 (Fed. Cir.1985) ("Huggies" and "Dougies"); *Chemical Corp. of Am. v. Anheuser–Busch, Inc.*, 306 F.2d 433 (5th Cir.1962) ("Where there's life ... there's bugs" and "Where there's life ... there's Bud"), *cert. denied*, 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963); *G.D. Searle & Co. v. Chas. Pfizer & Co.*, 265 F.2d 385 (7th Cir.) ("Dramamine" and "Bonamine"), *cert. denied*, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959); *Upjohn Co. v. Schwartz*, 246 F.2d 254 (2d Cir.1957) ("Syrocol" and "Cheracol"); *Hancock v. American Steel & Wire Co.*, 203 F.2d 737, 40 C.C.P.A. 931 (1953) ("Cyclone" and "Tornado"). In addition, questions regarding shade confusion are already being answered. *See In re Hodes–Lange Corp.*, 167 U.S.P.Q. 255 (TTAB 1970) (comparing a "brilliant yellow" band with a "bronzy gold" band); *see also Amsted Indus., Inc. v. West Coast Wire Rope & Rigging, Inc.*, 2 U.S.P.Q.2d 1755 (TTAB 1987) (comparing two adjacent wire rope strands of yellow to two adjacent strands of yellow and yellowish-green); *Youngstown Sheet & Tube Co. v. Tallman Conduit Co.*, 149 U.S.P.Q. 656 (TTAB

1966) (comparing a sewer pipe's gold band with a sewer pipe's orange band). Further, as with any technical issue, expert witnesses are available to testify regarding the similarity of the colors at issue.

■ The final traditional argument—the functionality doctrine—provides that if color is essential to the utility of a product or is the natural color of the product, then no party may acquire exclusive trademark rights in that feature or color. *See, e.g., Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2186 n. 10, 72 L.Ed.2d 606 (1982). The majority in *Owens–Corning* recognized that, "[a]s with utilitarian features in general, when the color applied to goods serves a primarily utilitarian purpose it is not subject to protection as a trademark." 774 F.2d at 1120–21. The functionality doctrine, therefore, is not inconsistent with protection of some color trademarks.

The Seventh Circuit court and the *Owens–Corning* dissent also stated that "[c]onsistency and predictability are compelling reasons for not lightly setting aside a settled principle of law." *NutraSweet*, 917 F.2d at 1027; *see Owens–Corning*, 774 F.2d at 1129 (Bissell, J., dissenting). Even before *Owens–Corning*, however, some courts were protecting color marks on a showing of secondary meaning. *See Owens–Corning*, 774 F.2d at 1118 (discussing *Yellow Cab Transit Co. v. Louisville Taxicab & Transfer Co.*, 147 F.2d 407 (6th Cir.1945) (protecting the color yellow for taxicab services), and *Clifton Mfg. Co. v. Crawford–Austin Mfg. Co.*, 12 S.W.2d 1098 (Tex.Civ.App.1929) (protecting reddish-brown for use on tents, tarpaulins, and wagon covers)). In addition, we have the split between the Federal Circuit and the Seventh Circuit, and as stated before, neither the United States Supreme Court nor this Court has ever per se prohibited the protection of color as a trademark.

Conversely, instead of promoting consistency and predictability, we believe that establishing a per se prohibition against protection of a color mark would cause confusion and inconsistency. As the Federal Circuit recognized:

The principal purpose of the Lanham Act was the modernization of trademark law, to facilitate commerce and to protect the consumer....

Section 45 of the Act defines "trademark" to include "any word, name, symbol, or device or combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." ...

The preamble to section 2 of the Lanham Act states that "[n]o trademark ... shall be refused registration on the principal register *on account of its nature*," unless one or more specific exceptions to registrability set forth in that section apply. Color is not such an exception.

*Owens–Corning*, 774 F.2d at 1119 (citations omitted). Moreover, when Congress broadened the definition of trademark in 1988, three years after *Owens–Corning* was decided, it "intentionally retain[ed] ... the words 'symbol or device' *so as not to preclude the registration of colors*, shapes, sounds or configurations where they function as trademarks." S.Rep. No. 100–515, 100th Cong., 2d Sess. 44 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5607 (emphasis added).

A per se rule prohibiting the protection of color alone would essentially render a valid color trademark registration ineffective and unenforceable. This would be extremely confusing and inconsistent. Although the aquamarine blue color of MDI's Blue Max tape is not registered, we think it would be equally confusing and inconsistent to rule that registered color marks may be protected, while common law color marks may not. Therefore, we decline to establish a per se prohibition against protecting color alone as a trademark. If MDI can establish all the normal trademark requirements in the blue color of its Blue Max leader splicing tape, that shade may be protected against infringement.

## II.

■ We must now determine whether the district court properly applied the color

depletion theory to this case. The court distinguished this case from *Owens–Corning* because leader splicing tape is available in a "rainbow of colors," and insulation was available only in its natural color or pink. 777 F.Supp. at 749 n. 2. The court found that there was a competitive need to use the color blue in the leader splicing tape industry, and allowing MDI to appropriate the color blue or a specific shade of blue would deter future competitors from entering the market "merely because existing manufacturers hold trademarks in the available colors." *Id.* at 749–50.

As we stated earlier, we are not convinced of the soundness of the color depletion theory. It is highly improbable that every distinguishable color shade has already been selected and would be subject to trademark protection. Moreover, the record only contains an enumeration of the colors currently used for leader splicing tape and the names of the companies that sell the particular colors of tape. Although copies of catalogs showing some of the different colors are attached as an exhibit, granting summary judgment at this early stage with regard to such a factual issue is improper.

We reverse and remand for further proceedings.